UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

PATRICIA A. SCOTT,                                                **REPORT AND**
                                                                  **RECOMMENDATION**

                              Plaintiff,

v.                                                                08-CV-0910(A)(M)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                              Defendant.
_____


              This case was referred to me by Hon. Richard J. Arcara to hear and report in

accordance with 28 U.S.C. §636(b)(1) [5][1].  Before me are the parties' cross-motions for

judgment on the pleadings pursuant to Fed. R. Civ. P. ("Rule") 12(c) [8, 12].  For the following

reasons, I recommend that defendant's motion for judgment on the pleadings be denied, and that

plaintiff's cross-motion be granted in part and denied in part.


                              **PROCEDURAL BACKGROUND**

              Pursuant to 42 U.S.C. §405(g), plaintiff seeks review of the final decision of the

Commissioner of Social Security denying her application for Supplemental Security Income

("SSI") and Disability Insurance Benefits ("DIB") [1].  Plaintiff filed an application for SSI and

DIB on March 6, 2003 (T138-140).[2]  This initial claim was denied on June 17, 2003 (T54-56).

---

[1]        Bracketed citations refer to the CM/ECF docket entries.

[2]        References to "T" are to the certified transcript of the administrative record filed by
defendant.

Plaintiff requested a hearing on the denied claim before an Administrative Law Judge (T56). The hearing was conducted before Administrative Law Judge Robert T. Harvey on August 17, 2004 (T71). Plaintiff was represented at the hearing by her attorney David A. Shults, Esq. (T46). On March 9, 2005, ALJ Harvey issued a decision denying plaintiff's claim, finding that plaintiff was not disabled within the meaning of the Social Security Act (T32-45). On May 9, 2005, plaintiff successfully sought review of ALJ Harvey's decision from the Appeals Council (T103-105). The Appeals Council remanded the case back to ALJ Harvey to properly evaluate plaintiff's subjective complaints and residual functional capacity ("RFC") and to obtain evidence from a vocational expert (T119-122).

On April 19, 2006, a second hearing was conducted before ALJ Harvey (T123). On September 18, 2006, ALJ Harvey issued a decision again denying plaintiff's claim (T20-30). ALJ Harvey's determination became the final decision of the Commissioner on October 16, 2008, when the Appeals Council denied plaintiff's request for review (T4-6).

## THE ADMINISTRATIVE RECORD

**A.      Relevant Medical Evidence**

On July 22, 1988, plaintiff sustained a low back injury when she slipped on steps in a work related accident (T106). She was treated with physical therapy. Id. Her condition improved as long as she avoided bending, heavy lifting, and prolonged sittings. Id. Plaintiff was involved in a motor vehicle accident on August 18, 1999, as a result of which she was diagnosed with closed head injury, sprain of the neck and left hip, and contusions to her left ribs (T275).

X-rays of her pelvis, cervical spine, chest, ribs and left shoulder, and a CT scan of the head were all normal.  Id.

## 1.    Dr. Supinski

In December 2000, Robert S. Supinski, M.D., examined plaintiff for complaints of left shoulder and hip pain (T265).   A January 31, 2001 MRI of plaintiff's shoulder showed no evidence of a significant tear, but it showed some changes of "tendonisis" and "[t]here was a type II acromin; however, on examination she has no pain whatsoever in the area of her findings.  All of her pain appears to be in her neck and her scapula today" (T264).  He "believe[d] that she most likely had a 25% disability from her prior back problem and perhaps 75% from her current problem." Id.  Regarding her left hip, Dr. Supinski opined "there may be a component of sciatica as well as trochanteric bursitis" (T266).

## 2.    Dr. Medved

Louis H. Medved, M.D.,  performed an independent neurological examination of plaintiff on June 3, 2002 in order to determine the degree of her disability and to apportion disability between the various accidents (T267-69).  Plaintiff complained of fatigue, muscle spasms, headaches, stomach pain, frequent urination, and numbness (T268).  Dr. Medved observed that plaintiff's cervical range of motion was normal, but flexion and extension increased her neck pain (T270).  He also observed that the range of motion in her left shoulder was limited as a result of pain and straight leg raises to 90 degrees increased her low back, left hip and thigh pain.  Id.  Dr.  Medved concluded that plaintiff's radiating pain in her left arm

suggested "cervical radioculopathy", but diagnosed plaintiff with myofascial pain syndromes (cervical, shoulder, arm, back, hip and leg) (T279).  He concluded that she has an "overall marked disability."  Id.


### 3. Dr. Dwyer

Plaintiff's primary physician, Thomas Dwyer, M.D., completed a disability determination form on April 21, 2003 (T289).  Dr. Dwyer stated that plaintiff has "cervical disc with right radiculopathy" and "chronic back pain." Id.  He opined that plaintiff was not capable of standing, and/or walking up to 6 hours per day, but had no limitation with sitting (T292).  He opined that plaintiff could lift and carry no more than 5 pounds.  Id.

An MRI of plaintiff's cervical spine dated April 28, 2003 revealed that plaintiff had a small disc herniation at C6-7 "that does not cause any impingement upon the cervical cord" (T326).  According to this MRI report, "there [was] no evidence for any significant foraminal stenosis" (T326).

In July 2003, plaintiff fell and complained of pain and swelling in her right knee (T320).  Plaintiff was prescribed Darvocet for her pain. Id.  An MRI of plaintiff's right knee was taken on July 16, 2003, and showed no abnormalities (T327).

Dr. Dwyer's October 23, 2003 progress report indicated that plaintiff had a decreased range of motion in her neck in all directions, decreased range of motion in her ability to bend sideways, and chronic neck and low back pain with "three ruptured C-spine disks" (T322).  He noted her strength was "pretty good." Id.  He suggested she continue her current medications.  Id.

On January 22, 2004, Dr. Dwyer noted a decreased range of motion in plaintiff's neck in all directions secondary to pain and muscle spasms, and a decrease in sensation in her arms (T323). According to a progress report dated July 6, 2004, plaintiff "was on Ultram 50 mg to a 100 mg three times a day taking Valium 4 mg in the morning and 2 mg in the afternoon and Flexeril at night" (T404).

On March 14, 2004, Dr. Dwyer completed a Medical Source Statement of Ability to do Work-Related Activities questionnaire (T355-T358), finding that plaintiff was able to "occasionally" lift/carry up to 20 pounds; "frequently" lift/carry up to 10 pounds; and stand/walk at least 2 hours in a 8-hour workday, periodically alternating between sitting and standing to relieve pain (T355-356). He also found that plaintiff was unable to climb, crouch, crawl and stoop, and was limited in pushing/pulling in her upper/lower extremities and in reaching in all directions (T355-356).

Dr. Dwyer completed a RFC questionnaire on August 13, 2004, which stated that plaintiff's pain and other symptoms were severe enough to "often" interrupt her attention and concentration (T379). He opined that she is "capable of low stress jobs"; is capable of walking one city block without rest or severe pain; can sit up to 5 minutes at one time before needing to stand and can stand up to 10 minutes before needing to sit or walk; is able to stand for a total of 2 hours in an 8-hour work day; needs to walk at least 5 minutes in an 8-hour workday; requires shifting positions at will from sitting, standing, or walking; and requires unscheduled breaks every five minutes during an 8-hour workday (T380-381). He also opined that plaintiff is able to "rarely" lift 10 pounds and "occasionally" lift less than 10 pounds (T381). He further opined that plaintiff could not twist, stoop or climb ladders, and could "rarely" crouch or climb stairs. Id.

On October 19, 2005, Dr. Dwyer completed another Medical Source Statement of Ability to do Work-Related Activities form (T395-397).   In that form, he opined that plaintiff was able to "frequently" lift/carry less than 10 pounds (T395).  He also opined that plaintiff can stand at least 2 hours in an 8-hour work day, but must periodically alternate between sitting and standing to relieve pain (T395-397).

### 4.     Dr. Guterman

On June 10, 2003, plaintiff was evaluated by neurosurgeon Lee R. Guterman, Ph.D, M.D. (T309).  He acknowledged plaintiff's 20 pound weight loss, myopia, frequent bowel movements and depression.  Id.  He noted that her pain medications include Vicodin and Darvocet (T309).  On examination, Dr. Guterman observed that plaintiff "appears to be in some constant pain."  Id.  He found that she had limited range of motion of her cervical spine on flexion, extension, lateral bending and rotation.  Id.  He noted that she complained of pain upon movement of her spine.  Id.  He diagnosed plaintiff with "cervical disc without myelopathy" and recommended that she continue physical therapy (T310).

A May 1, 2006 MRI of plaintiff's cervical spine revealed "asymmetric right foraminal herniation, C6-7 with degenerative disc changes" (T440).  On June 21, 2006, Dr. Guterman diagnosed plaintiff with "cervical disc without myelopathy" and recommended that plaintiff undergo a C6-7 anterior cervical disc and fusion (T433).

### 5.     Dr. Carstens

On June 9, 2004 and September 29, 2004, Billy R. Carstens, D.O., injected plaintiff with steroid nerve blocks (T383-385 and 403). On September 13, 2004, Dr. Carstens completed a RFC questionnaire in which he opined that plaintiff's pain and other symptoms would "constantly" interfere with her attention and concentration (T390). He opined that plaintiff is "incapable of even low stress jobs" because of her "severe pain dramatically interferes with work and the ability to do the work." Id. He opined that she can sit for less than a total of 2 hours in an 8-hour workday (T391) and that she is not able to lift any weight (T392). He concluded "she can not work at this time"(T392). On October 17, 2005, Dr. Carstens was unable to complete another RFC questionnaire because he stopped treating plaintiff (T416).

### 6.     Physical Therapist Jeremy Bittel

Jeremy Bittel, a physical therapist, evaluated plaintiff on June 16, 2004 (T370). Bittel acknowledged plaintiff's low back pain, lower extremity pain, neck pain and upper extremity pain. Id. Plaintiff's lumber flexion displayed minimal limitations with some pain, lumbar extension revealed moderate limitation, lumbar left lateral flexion showed moderate to maximal limitations, and lumbar rotation showed moderate limitations bilaterally (T371). Plaintiff's active range of motion in her shoulders was within normal limits. Id. Bittel concluded that plaintiff's "signs and symptoms appear to be consistent with a prior diagnosis of disk problems as well as myofascial pain syndrome due to previous history of accidents as well as a history of chronic low back pain" (T373).

### 7. Dr. Cranston

On August 8, 2005, Cheri Cranston, M.D., noted that plaintiff complained of "severe" neck pain because "over the weekend, she over did it" making flower arrangements (T411). Dr. Cranston observed that plaintiff "does not have any C-spine tenderness but does have a large muscle spasm in her left trapezius." Id. Dr. Cranston put plaintiff on a steroid burst of prednisone and advised her to continue her Tramadol. Id.

Dr. Cranston noted on April 4, 2006 that plaintiff is "continuing [to] get progressively worse with progressive decreasing weakness in her arms. She was offered surgery in 2003, but wanted to try to avoid this, however she continued to get worse" (T471). Dr. Cranston noted that plaintiff was taking Flexeril and Ultram for pain (T408, 471). Dr. Cranston observed that plaintiff "has decreased range of motion on rotating head to the left and decreasing motion on extension and flexion" (T471).

On May 9, 2006, Dr. Cranston completed a RFC Questionnaire, in which she opined that plaintiff was "incapable of even low stress jobs" because of pain (T426). She also opined that plaintiff cannot lift more than 10 lbs, rarely lift less than 10 lbs, stand/walk a total of less than 2 hours in an 8-hour workday, require unscheduled breaks every 15 minutes, and never twist, stoop or climb ladders (T426-429). She opined that plaintiff's pain and symptoms would "frequently" interfere with her attention and concentration (T426). Dr. Cranston diagnosed plaintiff with lumbar and cervical radiculopathy, myofascial syndrome, and anxiety. Id.

**8.    Dr. Saha**

Dr. Saha evaluated plaintiff on July 26, 2004 and diagnosed her with post traumatic stress disorder (T386).  According to plaintiff, she only was seen by Dr. Saha on one occasion (T500).

**B.    Consultative Examinations**

**1.    Dr. Medalle**

Consultative examiner, Ramon M. Medalle, M.D., evaluated plaintiff on May 13, 2003 (T299).  He observed that plaintiff did not appear to be in acute distress, walked without difficulty, did not use any assistive devices, and did not need help changing, shifting or getting on and off the exam table.  Id.  He noted that her squat was full and her gait was normal. Id.  Plaintiff's cervical spine revealed full flexion extension and full rotary movement and plaintiff's lumbar spine and shoulders showed full flexion Id.  Dr. Medalle found minimal scoliosis and slight degenerative changes at C6-C7 (T302).  Dr. Medalle diagnosed plaintiff with a "discogenic disorder" of the cervical and lumbar spine, "history of constipation", and "history of  labile hypertension" (T300-301).  He concluded that plaintiff was "mildly limited in activities requiring repetitive movements of the head or repetitive use of both upper extremities because of discogenic disorder of the cervical spine.  Claimant is also mildly limited in activities requiring prolonged sitting, prolonged standing, bending, and lifting,  because of discogenic disorder of the lumbar spine" (T300-301).

**C.        Administrative Hearing of April 19, 2006**

**1.        Plaintiff's Testimony**

The April 19, 2006 hearing was plaintiff's second hearing before ALJ Harvey (T480).  At the second hearing, ALJ Harvey summarized what transpired at the initial hearing on August 17, 2004, adding that plaintiff may "correct or amend anything that [he] may have written down that [she] feel[s] is inaccurate." Id.[3]   Plaintiff was 54 years old at the time of the hearing and became a registered nurse in 1979 (T480).  Plaintiff testified that she experiences constant neck, shoulder, arm, low back, right hip pain, and that every activity she attempts causes her pain (T481-86).

ALJ Harvey noted that plaintiff previously testified that some of her daily living activities included walking and using a treadmill for exercise (T486).  However, plaintiff testified that she no longer performs these activities. Id.

When asked whether her prior testimony that she cleans, cooks, does dishes, and vacuums remained true, plaintiff testified, "some of it –" (T484).  ALJ Harvey noted that plaintiff previously testified that she performs yard work, gardening, shopping, is able to drive a car approximately 40 miles a week, is able to bathe and dress herself (T484).  Plaintiff acknowledged her prior testimony, but added that she is no longer able to push a shopping cart or place heavy items into the cart; she has a hard time with chopping when cooking; and her daughter now puts the dishes away (T496-497).  Plaintiff continues to be unable to make her bed, take out the trash, sweep or mop, has difficulties with zippers, jars, and buttons (T484-485).

---

[3]        The August 17, 2004 hearing transcript is not contained in the record.

ALJ Harvey asked if "there's anything that [plaintiff] would like to correct or change." (T486). Plaintiff responded, "Yeah. My condition's [*sic*] deteriorated quite a bit in the last year. I've gotten a lot of atrophy to my arm muscles, and my grip's [*sic*] a lot weaker. I'm having problems with my urination, initiating it almost to the point that they're going to send me home with a catheter to really empty myself once a day" (T486-87). When asked by ALJ Harvey if her pain has changed in any way, plaintiff responded, "it's a lot worse. I think I've used up the medication I'm on . . . . I think I just have a tolerance to it now. My muscle spasms are almost constant. And they're to the point where they're bruising me, so " (T487).

ALJ Harvey questioned plaintiff about her past work history as a community health staff nurse, a research nurse, and bartender (T500-507). As a research nurse, plaintiff testified that she lifted approximately 30 to 50 pounds (T501). As a community health staff nurse, plaintiff testified that she lifted approximately 50 to 60 pounds (T504).

2.     **Vocational Expert Testimony**

Julie Andrews, a vocational expert, testified (T505-11) that plaintiff's past work as a community health staff nurse is considered skilled work with medium exertion (T507) and past work as a research nurse is considered skilled work with sedentary exertion. Id.

ALJ Harvey posed a series of hypotheticals to Ms. Andrews (T508). ALJ Harvey asked her whether an individual who could lift up to 20 pounds occasionally and 10 pounds frequently, could sit for two hours and walk for six hours in an 8-hour day, and has limitations to functions such as bending, kneeling, pushing, and pulling, but could not work around heavy moving machinery and areas with unprotected heights, would be able to perform any of the

plaintiff's past work (T508).  Andrews testified that an individual with these limitations would

not be able to perform  plaintiff's past work (T508).  Next, ALJ Harvey asked Ms. Andrews

whether an individual could perform plaintiff's past work assuming all the limitations assigned to

the hypothetical above, and further assuming that this individual could perform the demands of

light work (T508).  Ms. Andrews testified that an individual with these limitations would be able

to perform plaintiff's past work as a consultant nurse/research nurse.  Id.  However, when asked

to assume all the limitations ALJ Harvey assigned in his first hypothetical, plus plaintiff's self-

described  symptoms and limitations, Ms. Andrews testified that the individual could not perform

plaintiff's past relevant work (T509-510).


**D.      ALJ Harvey's September 18, 2006 Decision**

ALJ Harvey found that plaintiff  had the following combination of severe

impairments:  discogenic cervical spine disorder, myofascial pain syndrome, anxiety disorder and

post traumatic stress disorder, but did not have an impairment or combination of impairments

that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P

(T25).   He also concluded that plaintiff has the RFC for "light" work activities.  Specifically, he

found that plaintiff "is able to lift and carry 20 pounds occasionally and 10 pounds frequently;

stand or walk approximately six hours in an eight hour workday; and sit approximately two hours

in an eight hour workday, provided that she has the opportunity to change position during

customary rest and break periods (SSR 83-10).  The claimant has occasional limitations in

bending, climbing, stooping, squatting, kneeling, balancing and crawling.  She has occasional

limitations in pushing/pulling with upper extremities." Id.

In reaching his RFC determination, ALJ Harvey rejected Dr. Medved's conclusion that plaintiff had "marked disability" because "it is based upon subjective complaints . . . not objective clinical findings" (T27).   ALJ Harvey also rejected Dr. Dwyer's April 2003 finding that plaintiff had the capacity to lift and carry up to five pounds occasionally because "it is not based upon objective clinical evidence." Id. He also rejected it as being inconsistent with Dr. Dwyer's March 2004 RFC assessment, which indicated that plaintiff can carry up to 20 pounds occasionally, "despite purported continuation or worsening of the claimant's condition" (T28).   He also rejected Dr. Carsten's RFC opinion "because it is not based upon objective clinical evidence" (T28).   ALJ Harvey rejected Dr. Cranston's RFC evaluation because her "signature on that report differs from his entry notes" (T28).

ALJ Harvey also rejected plaintiff's subjective complaints, finding that while plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, plaintiff's statements concerning the intensity and effects of these symptoms were not entirely credible nor consistent with her allegations that she is disabled (T28-29).

Based upon plaintiff's RFC, ALJ Harvey concluded that plaintiff is capable of her past work as a research nurse/nurse consultant (T29).

## ANALYSIS

A.     **Scope of Judicial Review**

The Social Security Act states that, upon review of the Commissioner's decision by the district court, "the findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. §405(g).  Substantial evidence is that

which a "reasonable mind might accept as adequate to support a conclusion". <u>Consolidated Edison Co. of New York, Inc. v. NLRB</u>, 305 U.S. 197, 229 (1938).

Under this standard, the scope of judicial review of the Commissioner's decision is limited. This Court may not try the case *de novo,* nor substitute its findings for those of the Commissioner. *See* <u>Townley v. Heckler</u>, 748 F. 2d 109, 112 (2d Cir. 1984). Rather, the Commissioner's decision is only set aside when it is based on legal error or is not supported by substantial evidence in the record as a whole. *See* <u>Balsamo v. Chater</u>, 142 F. 3d 75, 79 (2d Cir. 1998). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the Court's independent analysis of the evidence may differ" from that of the Commissioner. <u>Martin v. Shalala</u>, 1995 WL 222059, *5 (W.D.N.Y. 1995) (Skretny, J.).

However, before deciding whether the Commissioner's determination is supported by substantial evidence, the court must first determine "whether the Commissioner applied the correct legal standard". <u>Tejada v. Apfel</u>, 167 F. 3d 770, 773 (2d Cir. 1999). "Failure to apply the correct legal standards is grounds for reversal." <u>Townley</u>, <u>supra</u>, 748 F. 2d at 112.


**B.      The Disability Standard**

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). The impairments must be  "of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy . . . ."  42 U.S.C.

§1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

"1.     The Commissioner considers whether the claimant is currently
        engaged in substantial gainful activity.

2.      If not, the Commissioner considers whether the claimant
        has a 'severe impairment' which limits his or her mental
        or physical ability to do basic work activities.

3.      If the claimant has a 'severe impairment,' the
        Commissioner must ask whether, based solely on medical
        evidence, claimant has an impairment listed in Appendix 1
        of the regulations.  If the claimant has one of these
        enumerated impairments, the Commissioner will
        automatically consider him disabled, without considering
        vocational factors such as age, education, and work
        experience.

4.      If the impairment is not 'listed' in the regulations, the
        Commissioner then asks whether, despite the claimant's
        severe impairment, he or she has residual functional
        capacity to perform his or her past work.

5.      If the claimant is unable to perform his or her past work,
        the Commissioner then determines whether there is other
        work which the claimant could perform.  The
        Commissioner bears the burden of proof on this last step,
        while the claimant has the burden on the first four steps."

Shaw v. Chater, 221 F. 3d 126, 132 (2d Cir. 2000).  *See* 20 C.F.R. §§404.1520, 416.920.

"New regulations, effective on August 23, 2003, limit the Commissioner's

burden at step five.  *See* 20 C.F.R. 404.1560(c) . . . .  The Commissioner's step-four RFC

determination (with the claimant bearing the burden of proof) now controls at both steps four

and five. . . . The Commissioner applies the RFC determination from step four to meet his

burden at step five. Using the claimant's RFC, the Commissioner must then show at step five

that 'there is other gainful work in the national economy which the claimant could perform.'"

Spain v. Astrue, __ F. Supp. 2d __, 2009 WL 4110294, *3 (E.D.N.Y. 2009).


**C.      ALJ Harvey Failed to Contact Dr. Cranston**

Plaintiff argues that ALJ Harvey failed to properly assess the medical evidence

and failed to apply the treating physician rule. Plaintiff's memorandum of law [12-3], pp. 20-23.

ALJ Harvey explained his rejection of Dr. Cranston's assessment as follows:

> "Dr. Cranston's residual functional capacity dated May 9, 2006 is rejected.  Dr.
> Cranston's signature on that report differs from [her] entry notes."  (T28).

The Commissioner argues that "while the ALJ may have inartfully commented on the

inconsistent handwriting between Dr. Crantson's progress notes and her later assessment, the

ALJ's rejection of Dr. Cranston's assessment reflects that there were inconsistencies between

the doctor's progress notes and her assessment".  Commissioner's reply memorandum of law

[13], pp. 2-3.  I disagree with the Commissioner's speculative assessment.  Had ALJ Harvey

intended to reject Dr. Cranston's RFC opinion as being inconsistent with her progress notes, he

would have so stated.  Instead, he plainly rejected it as a result of an inconsistent signature.

In light of the non-adversarial nature of a benefits proceeding, where there is a

gap in the record, the ALJ must affirmatively develop evidence to fill it.  *See* Pratts v. Chater, 94

F. 3d 34, 37 (2d Cir.1996). This duty exists whether or not plaintiff is represented by counsel.

*See* Perez v. Chater, 77 F. 3d 41, 46 (2d Cir.1996).   This duty includes the ALJ's obligation "to

recontact a treating physician in order to clarify the physician's opinion, when the opinion 'contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.'" Stevens v. Commissioner of Social Security Administration, 2008 WL 5057029, *5 (N.D.N.Y. 2008) (quoting 20 C.F.R. §§404.1512(e)(1), 416.912(e)(1)).

"The Secretary may not assume that doctors routinely lie in order to help their patients collect disability benefits." Lester v. Chater, 81 F. 3d 821, 832 (9th Cir. 1995). However, that is what occurred here. If ALJ Harvey had any question about the authenticity of the signature on the medical records, he had an obligation to contact Dr. Cranston for clarification before rejecting the record. See Giles v. Astrue, 2009 WL 2984049, *7 (C.D.Cal. 2009) ("The fact that the ALJ could not decipher the signature creates an ambiguity about which the ALJ should have inquired. It is inexplicable that the ALJ did not make such a simple inquiry."). This failure "is especially problematic in light of the fact that [s]he was a treating physician whose opinion must be given special evidentiary weight". Seltzer v. Commissioner of Social Security, 2007 WL 4561120, *10 (E.D.N.Y. 2007). Had ALJ Harvey not rejected Dr. Cranston's RFC assessment due to an inconsistent signature and considered the merits of her opinion, it may have impacted his RFC assessment as Dr. Cranston's RFC contained greater limitations than those found by ALJ Harvey (T426-429).

D.         **ALJ Harvey Properly Assessed  Plaintiff's Subjective Complaints**

Plaintiff alleges that ALJ Harvey did not properly assess plaintiff's credibility. Plaintiff's memorandum of law [12-3], p. 23.

"A claimant's testimony is entitled to considerable weight when it is consistent with and supported by objective clinical evidence demonstrating that the claimant has a medical impairment which one could reasonably anticipate would produce such symptoms." <u>Latham v. Commissioner of Social Security</u>, 2009 WL 1605414, *15 (N.D.N.Y. 2009). In this case, while the record as a whole makes clear that plaintiff suffers some level of pain, the medical evidence as to the degree of this pain is conflicting.

"Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings." <u>Snell v. Apfel</u>, 177 F.3d 128, 135 (2d Cir. 1999). When such a question of credibility arises, the decision of the ALJ must contain "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear . . . the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7P, 1996 WL 374186, *4 (S.S.A.). The ALJ must consider the entire case record as well as factors such as:

"1.     The individual's daily activities;

2.     The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.     Factors that precipitate and aggravate the symptoms;

4.     The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.     Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.     Any measures other than treatment the individual uses or

has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."

SSR 96-7P, 1996 WL 374186, *3 (S.S.A.).

Regarding plaintiff's credibility, ALJ Harvey found that

"the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible and, accordingly, are given lesser weight. Her allegations of disability are inconsistent with her activities of daily living and the objective evidence of record does not support the severity of the symptoms to which she testified. In her written statements . . . and her testimony at the two hearings the claimant stated that her daily activities included cleaning, cooking, washing dishes, laundry, yard work, gardening, working on her photography hobby three hours a week, using a computer, shopping, carrying packages, visiting, and driving a car 40 miles a week, and swim regularly. The claimant's allegations of disability are inconsistent with her activities of daily living.

Despite her long list of symptoms, the claimant said her doctors have told her she does not need cervical spine surgery. The undersigned notes that her complaints of constant global pain are not supported by her recreational activities of camping which she did on July 14, 2003. . . The claimant's allegations of PTSD and flashbacks to her motor vehicle accident and 'stroke effect' are rejected since there is no medical testimony to support this testimony. The claimant alleges poor concentration and memory and inability to follow directions due to anxiety and medication. However, she was very articulate at the hearings in describing her symptoms. Although the claimant testified to depression 75 percent of the time and treating physicians have based opinions, in part, on such asserted symptoms, the claimant is not currently being treated by a psychiatrist or psychologist. The undersigned concludes that the claimant's mental functioning deficits are not as severe as alleged.

The claimant asserts that her continuing disability arose out the injuries sustained in the August 1999 automobile accident. However, she returned to work full time as a registered nurse until October 2000. By her own admission, that was moderately strenuous work that required lifting 30 pounds on average. Thereafter, she also worked part time as a bartender under March 2001 at Swain Ski Center and part time as a bartender at the Sierra Inn until December 1999 lifting an average of 30 pounds. Although the bartender jobs were not actually performed at the level of sustained substantial gainful activity, her attempt to return to such moderately strenuous work is inconsistent with the physical deficits she has alleged and the assertion of inability to perform even minimally exertional work. The claimant's physical impairments are not as severe as alleged by the claimant" (T28-29).

"Although his findings do not explicitly indicate whether he considered each of the factors enumerated in the Regulations as outlined above, the court finds the reasons given by the ALJ sufficiently specific to conclude that he considered the entire evidentiary record". Delk v. Astrue, 2009 WL 656319, *4 (W.D.N.Y. 2009) (Curtin, J.). While plaintiff disagrees with ALJ Harvey's credibility assessment, he set forth the basis for his determination in sufficient detail and "the court is not to second-guess the credibility of witnesses whom the ALJ has heard." Skehill v. Sullivan, 1991 WL 120241, *2 (S.D.N.Y. 1991).

Plaintiff also argues that ALJ Harvey "focused only on his restatement of her prior hearing as he summarized and characterized it. He failed to acknowledge or discuss her written responses. He focused instead on the words he put in her mouth through his predominant use of leading questions, which were often lengthy and contained multiple issues." Plaintiff's memorandum of law [12-3], p. 24. Although ALJ Harvey reviewed plaintiff's prior hearing testimony to determine if it remained consistent, he provided plaintiff with the opportunity to correct or change her testimony (T486) and also afforded plaintiff's counsel

ample opportunity to question plaintiff concerning her limitations (T487-499). Therefore, I do not find that ALJ Harvey failed to fully develop the record concerning plaintiff's subjective complaints.

## CONCLUSION

For these reasons, I recommend that the Commissioner's motion for judgment on the pleadings [8] be DENIED and that plaintiff's cross-motion [12] be GRANTED in part and DENIED in part, and that the case be remanded to the Commissioner for further proceedings consistent with this opinion.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by June 28, 2010 (applying the time frames set forth in Fed. R. Civ. P. 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules of Civil Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply

with the provisions of Rule 72.3(a)(3), may result in the district judge's refusal to consider the

objection.

**SO ORDERED.**

DATED:        June 11, 2010

/s/ Jeremiah J. McCarthy_____
JEREMIAH J. MCCARTHY
United States Magistrate Judge
